## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES P. WHITE,<br><br>        Plaintiff,<br>    vs.<br><br>ENVISION HEALTHCARE CORP., WILLIAM A. SANGER, CHRISTOPHER A. HOLDEN, JAMES D. SHELTON, MICHAEL L. SMITH, LEONARD M. RIGGS, CAROL J. BURT, CYNTHIA S. MILLER, KEVIN P. LAVENDER, JOEY A. JACOBS, STEVEN I. GERINGER, JOHN T. GAWALUCK, and JAMES A. DEAL,<br><br>        Defendants. | Case No.:<br><br><br>__**DEMAND FOR JURY TRIAL**__ |

### COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff James P. White ("Plaintiff") brings this suit for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934.  In support of this complaint, Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### INTRODUCTION

1.      Plaintiff brings this action against Envision Healthcare Corporation ("Envision" or the "Company"), and the Company's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below), for violations of Sections 20(a) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9").  Specifically, Defendants solicit stockholder approval in connection with the sale of the Company to investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., ("Parent"), by way of Parent's wholly owned subsidiary Enterprise Merger Sub Inc.

("Merger Sub" and together with Parent, "KKR"), through a proxy statement that omits material facts necessary to make the statements therein not false or misleading.[1] Stockholders require this material information to decide whether to vote in favor of the proposed transaction.

2.      On June 11, 2018, the Company announced that it had entered into an agreement and plan of merger (the "Merger Agreement"), by which KKR will acquire all of the outstanding shares of Envision in an all-cash transaction (the "Proposed Transaction").[2] If consummated, Envision stockholders will receive $46.00 cash for each share of Envision stock that they own ("Merger Consideration"). The Proposed Transaction is valued at approximately $9.9 billion.

3.      On July 9, 2018, Defendants issued a materially incomplete and misleading disclosures in the Schedule 14A Information Statement (the "Proxy Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Proxy Statement is materially misleading in that it fails to provide adequate disclosure of material information related to the Proposed Transaction.

4.      Specifically, the Proxy Statement fails to disclose material information concerning the background of the Transaction, the financial projections prepared by the Company and relied upon by the Company's collection of financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan"), Evercore Group L.L.C. ("Evercore"), and Guggenheim Securities, LLC ("Guggenheim Securities", and together with "J.P. Morgan" and "Evercore", the "Financial Advisors"), and omits material information with respect to the inputs and assumptions underlying the Financial Advisors' respective valuation analyses and fairness opinions. Additionally, the Proxy Statement omits to disclose the basis for the engagement of three

---

[1] The Company and the Individual Defendants are referred to herein as "Defendants."

[2] This marks the second time in the past year that the two entities have elected to pursue a strategic transaction with one another. Last year, Envision sold its ambulance business to a subsidiary of KKR for $2.4 billion to focus on physician staffing and ambulatory surgery centers.

separate conflicted financial advisors during the sales process, or to fully detail the conflicts that these financial advisors were operating under.  The omission of this material information renders the Proxy Statement materially incomplete and misleading in violation of §§ 14(a) and 20(a) of the Exchange Act.

5.      For these reasons and as set forth in detail herein, the Individual Defendants, and the Company, have violated federal securities laws.  Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder

7.      Personal jurisdiction exists over each Defendant either because the Defendant is incorporated in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took effect under the laws in this District; (ii) Envision is incorporated in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred under the laws of this District; (iv) relevant documents pertaining to

Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, the owner of shares of Envision common stock.

10.     Defendant William A. Sanger ("Sanger") has served as a director of Envision since 2016. Sanger currently serves as Chairman of the Board.

11.     Defendant Christopher A. Holden ("Holden") has served as a director of Envision since 2007. He currently serves as President and Chief Executive Officer ("CEO") of Envision.

12.     Defendant James D. Shelton ("Shelton") has served as a director of Envision since 2016.

13.     Defendant Michael L. Smith ("Smith") has served as a director of Envision since 2016.

14.     Defendant Leonard M. Riggs ("Riggs") has served as a director of Envision since 2016.

15.     Defendant Carol J. Burt ("Burt") has served as a director of Envision since 2016.

16.     Defendant Cynthia S. Miller ("Miller") has served as a director of Envision since 2011.

17.     Defendant Kevin P. Lavender ("Lavender") has served as a director of Envision since 2004.

18.     Defendant Joey A. Jacobs ("Jacobs") has served as a director of Envision since 2013.

19.     Defendant Steven I. Geringer ("Geringer") has served as a director of Envision since 1997.

20.     Defendant John T. Gawaluck ("Gawaluck") has served as a director of Envision since 2015.

21.     Defendant James A. Deal ("Deal") has served as a director of Envision since 1992.

22.     Defendants Sanger, Holden, Shelton, Smith, Riggs, Burt, Miller, Lavender, Jacobs, Geringer, Gawaluck, and Deal, are collectively referred to as "Individual Defendants" and/or the "Board."

23.     Defendant Envision provides healthcare services, including physician-led services, ambulatory surgery center management, post-acute care and medical transportation. It owns and operates surgery centers and surgical hospital with medical specialties ranging from gastroenterology to ophthalmology and orthopedics. Envision operates ambulatory surgery centers; and provides a suite of medical transportation solutions and deliver prevention, intervention and post-acute care services. The company also offers outsourced physician services in the following specialties: emergency medicine, anesthesiology, hospital medicine, women's and children's services, radiology and surgery. Its brands include American Medical Response, EmCare and Evolution Health. The Company, incorporated in Delaware, was founded in December 2016 and is headquartered at 1A Burton Hills Boulevard, Nashville, TN 37215. Envision's common stock trades on the New York Stock Exchange under the symbol "EVHC."

## OTHER RELEVANT ENTITIES

24.     KKR is a leading global investment firm that manages multiple alternative asset classes, including private equity, growth equity, energy, infrastructure, real estate and credit, with strategic manager partnerships that manage hedge funds. KKR aims to generate attractive

investment returns for its fund investors by following a patient and disciplined investment approach, employing world-class people, and driving growth and value creation with KKR portfolio companies. KKR invests its own capital alongside the capital it manages for fund investors and provides financing solutions and investment opportunities through its capital markets business. KKR is incorporated in Delaware and maintains its principal executive offices at 9 West 57th Street Suite 4200 New York, NY 10019. KKR's common stock trades on the New York Stock Exchange under the symbol "KKR."

25.     Merger Sub is a Delaware corporation and an indirect wholly owned subsidiary of KKR. It was formed solely for the purpose of entering into the merger agreement and completing the transactions contemplated by the merger agreement.

## FURTHER SUBSTANTIVE ALLEGATIONS

**Company Background**

26.     Envision is a leading provider of physician-led services, post-acute care, and ambulatory surgery services. As of March 31, 2018, Envision delivered physician services, including in the areas of emergency department and hospitalist services, anesthesiology services, radiology and teleradiology services, and children's services to more than 1,800 clinical departments in healthcare facilities in 45 states and the District of Columbia. Envision owns and operates 261 surgery centers and one surgical hospital in 35 states and the District of Columbia, with medical specialties ranging from gastroenterology to ophthalmology and orthopedics.

**The Merger Process**

27.     In the third quarter of 2017, the Company received communications from certain of its stockholders suggesting that the Company should review various strategic or financial alternatives, including executing share repurchases or exploring a sale of the Company.

28.     During the months of September and October, the board and members of management routinely discussed these and other alternatives in light of the Company's overall strategic plan, competitive position, and broader healthcare sector trends. To assist in these discussions, the board discussed and reviewed, together with Guggenheim Securities; Evercore; Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), and Bass, Berry & Sims PLC ("Bass Berry") the Company's business and strategic plan and a range of strategic alternatives potentially available to the Company. Specifically, at an in-person meeting held on October 26 and 27, 2017, representatives of Guggenheim Securities and Evercore discussed a range of potential strategic alternatives based on management's long-term forecasts.

29.     Following these meetings, the board then discussed the roles of Evercore and Guggenheim Securities in connection with the strategic alternatives review and directed management also to consider adding an additional financial advisor with extensive contacts across the healthcare sector to supplement Evercore and Guggenheim Securities as a financial advisor in connection with the review.

30.     Beginning in November 2017, the Company began to receive inbound interest in a potential transaction from third parties. Additionally, around this time, the Company elected to retain J.P. Morgan as an additional financial advisor in connection with the strategic alternatives. The Preliminary Proxy fails to disclose the basis for the engagement of a third separate financial advisors during the sales process;

31.     On November 30, 2017 and December 1, 2017, the board held an in-person meeting at which time, representatives of the financial advisors provided an overview of a proposed process for conducting the strategic alternatives review. During this same meeting, the board and representatives of the financial advisors discussed the possibility of reaching out to

potential counterparties under non-disclosure agreements to gauge interest once management's 2018 and long-term forecasts were complete, and directed management to prepare the financial and operational information necessary to solicit initial indications of interest after the end of the year.

32.     Additionally, management was specifically directed not to engage in any discussions with any potential counterparties regarding future employment or other opportunities, unless and until expressly authorized to do so by the board.

33.     Less than a month later, on January 22, 2018, the board, together with representatives of the financial advisors, met to discuss the strategic alternatives review process. Following this discussion, the board authorized: (i) the financial advisors, working with management, to reach out to potential counterparties to determine their interest in acquiring the whole Company or the ambulatory surgery center ("ASC") business, including those parties identified on the list of potential counterparties presented by the financial advisors that, in the judgment of the board, management and the financial advisors, would not face significant execution risk in consummating a strategic transaction; (ii) the legal advisors, working with management, to negotiate and execute non-disclosure agreements with potential counterparties; (iv) management to provide the Company's five-year financial forecast model (the "Management Case") and limited due diligence materials to potential counterparties that execute non-disclosure agreements; and (iv) the financial advisors to request preliminary indications of interest by mid-February for acquiring the whole Company or the ASC business.

34.     The Financial Advisors went to work almost immediately. Beginning on January 23, 2018, representatives of the financial advisors began contacting financial sponsors and other industry participants regarding a potential strategic transaction. As part of this process,

representatives of the financial advisors contacted 25 parties, including the potential counterparties that the board had authorized the financial advisors to contact at the board's meeting held on January 22, 2018, plus, with the approval of the board, several additional parties identified thereafter by the financial advisors that, in the judgment of management and the financial advisors, had a demonstrated interest in the healthcare sector, and could be interested in pursuing a strategic transaction with the Company. Of the 25 parties initially contacted, 22 of the parties (including KKR) entered into non-disclosure agreements with the Company and were provided due diligence materials. 21 of these non-disclosure agreements included standstill provisions, none of which standstill provisions remain in effect.

35.    The Financial Advisors set February 16, 2018 as the deadline for preliminary indications of interests, and from February 16, 2018 to February 20, 2018, nine parties, consisting solely of financial sponsors, submitted preliminary indications of interest to acquire the whole Company for cash.[3] Additionally, five parties, including four industry participants and one financial sponsor, submitted preliminary indications of interest to acquire the ASC business implying valuations for the ASC business ranging from $2.5 billion to $3.5 billion (on a pre-tax basis). The remaining eight parties that had executed non-disclosure agreements with the Company did not provide preliminary indications of interest for either the whole Company or the ASC business.

---

[3] These nine parties consisted of: KKR, which indicated a price range of $42.00 to $46.00 per share; a second bidder ("Bidder 2"), which indicated a price range of $42.00 to $45.00 per share; a third bidder ("Bidder 3"), which indicated a price range of $43.00 to $46.00 per share; a fourth bidder ("Bidder 4"), which indicated a price range of $48.00 to $51.00 per share; a fifth bidder ("Bidder 5"), which indicated a price range of $50.00 to $53.00 per share; a sixth bidder ("Bidder 6"), which indicated a price range of $50.00 to $54.00 per share; a seventh bidder ("Bidder 7"), which indicated a price range of $42.00 to $45.00 per share; an eighth bidder ("Bidder 8"), which indicated a price range of $53.00 to $60.00 per share; and a ninth bidder ("Bidder 9"), which indicated a price range of $46.00 to $50.00 per share.

36.     Immediately following the receipt of these offers, the Board met in person, together with representatives of the financial advisors and the legal advisors, to continue its review of strategic alternatives, including a review of the preliminary indications of interest, and other alternatives including continuing to operate the Company on a stand-alone basis. During this same meeting, the board discussed the fact that one of the Company's stockholders submitted a notice of its intention to nominate four candidates for election to the board at the Company's 2018 annual meeting of stockholders. While the stockholder subsequently withdrew its nomination notice on July 2, 2018, no further details are provided regarding this nomination notice.

37.     From March 10, 2018 to March 16, 2018, based on the preferences expressed by the parties and an evaluation of how best to enhance the likelihood of stronger check-in indications of interest, representatives of the financial advisors contacted the seven parties that had expressed an interest in forming consortiums for the potential acquisition of the whole Company and authorized them to organize into three consortiums. These consortiums consisted, respectively, of Bidder 2 and Bidder 3 ("Bidder Group A"), Bidder 4, Bidder 5 and Bidder 6 ("Bidder Group B"), and Bidder 7 and Bidder 8 ("Bidder Group C"). KKR and Bidder 9 did not ask to form consortiums. The Company also provided potential counterparties access to the virtual data room.

38.     Approximately one month later, on April 17, 2018, Bidder Group A, Bidder Group B, and KKR provided check-in indications of interest for the whole Company, indicating, respectively, a price range of $43.00 to $45.00 per share, a price of $50.00 per share, and a price of $50.00 per share, subject to additional financial and business due diligence. Bidder Group C

10

and Bidder 9 notified the Company that they would not provide check-in indications of interest and subsequently withdrew from the process.

39.     Immediately thereafter, on April 19, 2018, the board held a meeting to review the updated submissions. Following discussion, the board authorized the Company's advisors, working with management: (i) to proceed with the Company's process to explore the sale of the whole Company with Bidder Group A, Bidder Group B, and KKR; (ii) not to proceed separately with the Company's process for exploring a sale of the ASC business at the current time; and (iii) to permit Bidder Group A, Bidder Group B, and KKR, if they requested, to have discussions with bidders for the ASC business, on a non-binding basis, to the extent that the Company's advisors and management determined that such discussions were likely to enhance the process to explore the sale of the whole Company.

40.     On April 23, 2018, the Company circulated a form of merger agreement, together with draft disclosure schedules, to Bidder Group A, Bidder Group B, and KKR.

41.     From April 25, 2018 to May 31, 2018, Bidder Group A, Bidder Group B, and KKR participated in over 40 diligence meetings with management, which were attended by the Company's advisors. These meetings included additional in-person management meetings on May 9, 2018 and May 11, 2018 with Bidder Group A and KKR, respectively, as well as extended calls throughout early May 2018 between members of management and representatives of Bidder Group B regarding the outstanding diligence issues identified by them.

42.     On May 14, 2018, at the direction of the Board, representatives of J.P. Morgan contacted Bidder Group A, Bidder Group B, and KKR to request that they provide final proposals no later than May 31, 2018 and to provide any comments to the draft definitive documentation previously provided by the Company no later than May 24, 2018. Shortly

thereafter, Bidder Group B consortium expressed that they were no longer interested in pursuing a strategic transaction with the Company.

43.     On May 31, 2018, representatives of KKR informed the Financial Advisors that they and their advisors were still in the process of conducting financial diligence and that they would not be in a position to provide a final proposal until that analysis was finalized. On June 1, 2018, representatives of Bidder Group A indicated that they would not submit a final proposal and withdrew from the process.

44.     With only one bidder remaining in the process, on June 4, 2018, KKR submitted a final proposal to acquire the Company, which indicated a price of $45.25 per share, together with revised versions of the transaction documents. Over the next two days, the parties, and their respective representatives, engaged in negotiations regarding the valuation of the Company implied by KKR's $45.25 per share proposal, and on June 6, 2018, KKR representatives provided representatives of J.P. Morgan with a revised proposal that KKR stated was its best and final proposal to acquire the Company for $46.00 per share.

45.     On June 10, 2018, the Board held a meeting to discuss and consider whether to approve the company's entry into definitive transaction documents providing for a merger of the Company with and into an affiliate of KKR. During the meeting, each of the Financial Advisors presented to the board their respective financial analyses and each Financial Advisor rendered to the board its oral opinion, which was subsequently confirmed in writing on the same date, to the effect that, as of June 10, 2018 and based upon and subject to the matters considered, the procedures followed, the assumptions made and various limitations of and qualifications to the review undertaken, as set forth in each financial advisor's respective written opinion, the $46.00

per share in cash to be paid to the holders of shares of common stock pursuant to the merger agreement was fair, from a financial point of view, to such holders.

46.    Additionally, and apparently for the first time, the Board reviewed a number of the conflicts disclosure letters submitted by the financial advisors in which the respective financial advisors disclosed relationships with KKR and/or its affiliates. After reviewing the disclosures, the Board determined that no Financial Advisor's disclosed relationships with KKR constituted a disqualifying conflict with respect to its engagement by the Company in connection with the strategic alternatives review.

47.    After further discussion and deliberation, the Board unanimously approved the transaction documents and the merger and resolved to recommend that the stockholders of the Company adopt the merger agreement. Later that day, following the Board meeting, the parties executed the final agreements, and on June 11, 2018, the parties issued a press release announcing the transaction.

**The Merger Announcement**

48.    In a press release dated June 11, 2018, Envision announced that it had entered into a Merger Agreement with KKR pursuant to which KKR will acquire all of the outstanding shares of Envision common stock for $46 per share in cash.

49.    The press release states in pertinent part:

NASHVILLE, TN – June 11, 2018 – Envision Healthcare Corporation ("Envision" or the "Company") (NYSE: EVHC) today announced it has entered into a definitive agreement to be acquired by global investment firm KKR in an all-cash transaction for approximately $9.9 billion, including the assumption or repayment of debt. Under the terms of the agreement, which has been unanimously approved by Envision's Board of Directors (the "Board"), KKR will acquire all of the outstanding shares of Envision's common stock for $46.00 per share in cash, representing a 32% premium to Envision's volume-weighted average share price (VWAP) from November 1, 2017, the day immediately following the Company's first announcement that it was reviewing strategic

13

alternatives. The transaction price represents a multiple of 10.9x trailing 12 months Adjusted EBITDA and 10.1x 2018 anticipated Adjusted EBITDA.

The agreement represents the culmination of the Board's comprehensive review of strategic alternatives to enhance shareholder value. During the last seven months, the Board, with the assistance of three independent financial advisors and legal counsel, examined a full range of options to generate shareholder value, including capital structure alternatives, potential acquisitions, portfolio optimization, a potential sale of the whole company, and continued operation as a standalone business. The Board oversaw an extensive process that involved outreach to 25 potential buyers, including financial sponsors and strategic entities, and invited proposals for all or parts of the business. After consideration of the opportunities, risks and uncertainties facing the Company and the broader sector, as well as the alternatives available to the Company, the Board determined that the KKR proposal presented the best opportunity to maximize value for shareholders.

James D. Shelton, Envision's Lead Independent Director, commented, "After conducting a robust review of the business and competitive landscape, the Company's opportunities and challenges, and the strategic and financial alternatives available to the Company, the Board unanimously believes that this transaction will deliver the most value to Envision's shareholders."

Christopher A. Holden, Envision's President, Chief Executive Officer and Director, added, "Envision's leadership team – including both the Board and management – have been singularly focused on driving value for our shareholders and have taken decisive action in furtherance of that goal, including the implementation of a comprehensive operational improvement plan and a robust review of strategic alternatives. Today's announcement reflects the extensive efforts by our team to explore all opportunities to deliver value for our shareholders."

"Envision is a leading provider of physician-led services in a health care system in which physician-patient interactions have a pronounced impact on nearly all health care decisions. Envision has a very strong reputation for delivering high-quality, patient-focused care through its network of 25,000 clinical professionals at thousands of hospitals, surgery centers and alternate sites of care across the country," said Jim Momtazee, Head of KKR's Health Care investment team. "We are excited to partner with the outstanding team led by Chris Holden to help build upon the strong foundation in place and accelerate Envision's growth going forward."

The completion of the transaction, which is targeted for the fourth quarter of 2018, is subject to customary closing conditions and regulatory approvals. Envision intends to present the proposed transaction to its shareholders for approval at the Company's 2018 Annual Meeting, which will be scheduled as

soon as practicable following the filing and review of proxy materials. The Company intends to hold its Annual Meeting no later than October 1, 2018. Upon the completion of the transaction, Envision will become a private company, and its common stock will no longer be traded on the New York Stock Exchange.

**The Proxy Statement Omits Material Information**

50.     On July 9, 2018, Envision filed the Proxy Statement with the SEC.  As alleged below and elsewhere herein, the Proxy Statement contains material misstatements and omissions of fact that must be cured to allow Envision's stockholders to render an informed decision with respect to the Proposed Transaction. As alleged below and elsewhere herein, the Proxy Statement contains material misrepresentations and omissions of fact that must be cured to allow Envision stockholders to render an informed decision with respect to the Proposed Transaction.

51.     Specifically, as discussed below, the Proxy Statements omits material information regarding: (i) Financial Advisors' Conflicts of Interest; (ii) Envision's Financial Projections; (iii) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisors, JP Morgan, Evercore, and Guggenheim; and (iv) the background of the Proposed Transaction. This material information directly impacts the Company's expected future value as a standalone entity, and its omission renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to Envision stockholders. Accordingly, Envision stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

### *Material Omissions Concerning the Background of the Transaction*

52.     With regard to the omission of material information relating to the sale process leading up to the Proposed Transaction, the Proxy Statement omits material information concerning the influence that activist stockholders had on the sale process, as well as the timing and circumstances surrounding the Board's decision to initiate the sale process.

53.     In pursuing the Proposed Transaction, the Board did not elect to create a committee of disinterested directors to run the sales process, and the Proxy Statement omits to disclose who, if any, of the individual defendants took a leading role in directing the sales process. If a non-independent director took an outsized role in the sale process, Plaintiff is entitled to this information. As noted in the Proxy Statement, institutional investors own a disproportionate amount of Envision, approximately 50% of the Company's outstanding shares as of January 2018. As a direct consequence of this ownership interest, the Proxy Statement notes that from January 23, 2018 to January 25, 2018, members of management, accompanied by the Chair of the nominating and corporate governance committee, conducted an investor roadshow at which they discussed and solicited feedback from the Company's stockholders concerning, amongst other issues, the strategic alternatives available to the company.

54.     In the aftermath of this roadshow, the Proxy Statement notes that:

On February 21, 2018, one of the Company's stockholders submitted a notice of its intention to nominate four candidates for election to the board at the Company's 2018 annual meeting of stockholders, which notice was subsequently supplemented on March 16, 2018 with notice of a fifth candidate. The board discussed the February 21, 2018 notice at its meeting. The stockholder subsequently withdrew its nomination notice on July 2, 2018.

Proxy Statement at 39.

55.     The Proxy Statement fails to indicate the specific nature or identity of any such stockholder behaving in an activist manner, what their demands were, if any, the reasons for the February 21, 2018 nomination and subsequent withdrawal, communications between such investors and the Board, and what impact, if any, such investors had on the sales process leading to the Proposed Transaction. Adding to this confusion is the absence of information concerning the timing and circumstances of the Board's initial decision to pursue the sale process. As noted in the Proxy Statement:

> In the third quarter of 2017, the Company received communications from certain of its stockholders suggesting that the Company should review various strategic or financial alternatives, including executing share repurchases or exploring a sale of the Company.

Proxy Statement at 36.[4]  The identity of the "certain of its stockholders," is never disclosed in the Proxy Statement. Clearly investors wielded a substantial influence on the Board's decision making throughout the sale process. However, information relating to these investors and the role that individual Board members played in the sale process is notably absent from the Proxy Statement. The Proxy Statement fails to indicate the specific nature or identity of the stockholders behaving in an activist manner, what their demands were, if any, the stated reasons for the nomination and subsequent withdrawal, communications between such investors and the Board, and what impact, if any, such investors had on the sales process. Accordingly, without further information regarding the nature and participants to the Board's discussions with these stockholders and institutional investors, Envision's stockholders are being misled as to the nature, origins and background of the Proposed Transaction, and are unable to evaluate what impact, if any, these investors had on the sales process and its ultimate outcome.

### Material Omissions Concerning the Financial Advisors' Conflicts of Interest:

56.    With regard to the potential conflicts of interest faced by the Financial Advisors, the Proxy Statement fails to adequately disclose material information concerning the prior relationship that these Financial Advisors had with Envision and KKR.

57.    Disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4). Such information is also material to Envision

---

[4] Furthermore, as discussed *infra*, the decision to retain Evercore as a financial advisor may have stemmed from the role Evercore had been serving as a financial advisor to the Company, including in connection with "recent stockholder communications."

shareholders. It is imperative for shareholders to be able to understand what factors might influence the Financial Advisors' analytical efforts. A financial advisor's own proprietary financial interest in a transaction must be carefully considered when assessing how much credence to give its analyses and opinions. A reasonable shareholder would want to know what important economic motivations that the advisor, employed by a board to assess the fairness of the merger to the shareholders, might have. This is especially true when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to them—given their overall economic interest—than only approving a deal at truly fair price to shareholders.

58.     Accordingly, as a result of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, full disclosure of investment banker compensation and all potential conflicts is necessary for stockholders to have a materially complete sense of the conflicts of interests operating in the background. As noted on Page 44 of the Proxy Statement, on June 10, 2018, the day that the merger agreement was executed, the Board reviewed and discussed, apparently for the first time, the extent of the Financial Advisors' prior relationships with Envision and KKR and/or its affiliates:

> Following this discussion, the advisors (other than the Wachtell Lipton representative) left the meeting, at which point the representative of Wachtell Lipton reviewed the conflicts disclosure letters made available to the board by the financial advisors prior to the meeting. The Wachtell Lipton representative noted that each of the financial advisors had disclosed relationships with KKR and/or its affiliates and discussed the relationships that had been disclosed. The board reviewed the disclosures and determined that no financial advisor's disclosed relationships with KKR constituted a disqualifying conflict with respect to its engagement by the Company in connection with the strategic alternatives review.

59.     While the Proxy statement notes that these relationships did not constitute a disqualifying conflict with respect to its engagement by the Company in connection with the

strategic alternatives review, Envision stockholders must be provided sufficient information so that they themselves can evaluate these past relationships in order to have a materially complete sense of the conflicts of interests operating in the background.

60.     As disclosed on Page 74 of the Proxy Statement:

[D]uring the past two years, Guggenheim Securities has performed the following financial advisory or investment banking services for Envision: (i) acted as Envision's financial advisor in connection with the sale of its American Medical Response, Inc. unit to Air Medical Group Holdings, LLC, a portfolio company of KKR, which closed in March 2018 and (ii) acted as financial advisor to Amsurg Corp. in connection with its merger with Envision, which closed in December 2016. During the past two years, Guggenheim Securities has also been engaged to provide financial advisory, capital markets and other investment banking services in connection with matters unrelated to the merger that involved KKR and its affiliates, for which Guggenheim Securities has received agreed upon compensation. Specifically during the past two years, such matters have included, among other transactions: (i) the reorganization of Energy Futures Holdings Corporation, (ii) various financings for Life Time Fitness, Inc., (iii) initial public offerings and follow-on equity offerings for National Vision, Inc. and US Foods Holding Corp., and (iv) the acquisition of Entellus Medical, Inc. by Stryker Corporation. During the two years ended June 10, 2018, Guggenheim Securities received compensation from Envision of approximately $38 million for financial advisory and investment banking services unrelated to the merger and received compensation from KKR and its affiliates of approximately $9 million for financial advisory, capital markets and other investment banking services unrelated to the merger.

61.     With regard to Evercore's prior relationship with Envision and KKR, Page 64 of the Proxy Statement discloses:

During the two-year period prior to the date of its written opinion, Evercore and its affiliates have provided financial advisory services to Envision for which Evercore received fees, including the reimbursement of expenses, in an amount equal to approximately $5 million in the aggregate. During the two-year period prior to the date of its written opinion, Evercore and its affiliates have also provided financial services to KKR, an affiliate of Parent, and its affiliates and portfolio companies, for which Evercore received fees, including the reimbursement of expenses in an amount equal to approximately $32.5 million in the aggregate. In the future, Evercore may provide financial or other services to KKR and its affiliates and portfolio companies, and in connection with any such services Evercore may receive compensation.

62.     Finally, with regard to J.P. Morgan's prior relationship with Envision and KKR, Page 56 of the Proxy Statement discloses:

> During the two years preceding the date of its opinion, J.P. Morgan and its affiliates have had commercial or investment banking relationships with the Company and Parent and certain of their affiliates, for which J.P. Morgan and its affiliates have received customary compensation. Such services during such period have included acting as joint lead arranger and bookrunner on the Company's term loan which closed in December 2016 and joint lead bookrunner on an offering of equity securities by an affiliate of KKR which closed in November 2017. In addition, J.P. Morgan's commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of the Company and Parent and certain of its affiliates, for which it receives customary compensation or other financial benefits. In addition, as of the date of its opinion, J.P. Morgan and its affiliates held, on a proprietary basis, less than 2% of the outstanding common stock of the Company and 3.77% of the outstanding common units of an affiliate of Parent. During the two year period preceding the delivery of its opinion, the aggregate fees received by J.P. Morgan from the Company were approximately $46.0 million and from KKR and certain of its affiliates were approximately $110.0 million.

63.     Clearly, the Financial Advisors have enjoyed a lucrative relationship with both Envision and KKR in the past two years. However, the extent of these relationship, and the precise nature of the work performed is not fully disclosed in the Proxy Statement. For example, the Proposed Transaction marks the second of two consecutive strategic transactions between Envision and KKR. Last year, Envision agreed to sell its ambulance business to a subsidiary of KKR for $2.4 billion to focus on physician staffing and ambulatory surgery centers (the "American Medical Response Sale").  Guggenheim acted as the exclusive financial advisor to Envision in relation to the American Medical Response Sale, however, the Proxy Statement glosses over the fact that Guggenheim was simultaneously operating as a financial advisor on two concurrent, and ostensibly independent, strategic transactions involving Envision and KKR.

64.     With regard to Evercore, the decision to retain the financial advisor was ostensibly related to the role Evercore had been serving as a financial advisor to the Company,

including in connection with "recent stockholder communications." As noted *supra*, certain investors may have played an outsized role in steering the Company towards the Proposed Transaction, accordingly a full disclosure of Evercore's role in relation to "recent stockholder communications," is necessary for Envision stockholders to evaluate Evercore's potential conflicts of interest. Furthermore, the Proxy Statement discloses that Evercore received fees, including the reimbursement of expenses, in an amount equal to approximately $5 million in the aggregate for financial advisory services performed on behalf of Envision, and $32.5 million in the aggregate for financial services to KKR, an affiliate of Parent, and its affiliates and portfolio companies. While Evercore discloses the compensation it has received for such services, it fails to detail the precise nature of the work performed. As the Proxy Statement fails to disclose the circumstances surrounding the financial advisors retention or the nature of the work that Evercore performed in order to justify these fees, a full disclosure of the work performed by Evercore is necessary for Envision stockholders to properly evaluate the potential conflicts of interest faced by Evercore.

65. Finally, with regard to J.P. Morgan, the Proxy Statement discloses that the aggregate fees received by J.P. Morgan from the Company were approximately $46.0 million and from KKR and certain of its affiliates were approximately $110.0 million. While the Proxy Statement discloses the compensation it has received for such services, it fails to detail the precise nature of the work performed. In explaining away the approximately $150 million that J.P. Morgan has received from KKR and Envision within the past two years, the Proxy Statement simply notes that some of J.P. Morgan's services on behalf of KKR and Envision have included acting as joint lead arranger and bookrunner on the Company's term loan which closed in December 2016 and joint lead bookrunner on an offering of equity securities by an affiliate of

KKR which closed in November 2017. As the Proxy Statement fails to fully disclose the nature of the work that J.P. Morgan performed in order to justify these fees, a full disclosure of the work performed by J.P. Morgan is necessary for Envision stockholders to properly evaluate the potential conflicts of interest faced by Evercore.

66.     As noted above, all three financial advisors have been heavily linked to both KKR and Envision within the past two years. Evercore has received fees from Envision and KKR within the last two years in the amount of $5 million and $32.5 million, respectively, and Guggenheim has received fees from Envision and KKR within the last two years in the amount of $38 million and $9 million, respectively. It is worrying enough that Envision retained two conflicted financial advisors. However, despite Evercore's and Guggenheim's conflicts, the Board still decided to retain an even more conflicted financial advisor. JP Morgan has made $46 million in services to the Company in the last two years, and $110 million in services to KKR in the same time frame. Further complicating this issue is the absence of information in the Proxy Statement explaining the Board's consideration of these potential conflicts of interest. Specifically, the only reference to the Board reviewing these conflicts occurred on June 10, 2018, the day the merger was agreed.  By omitting to disclose facts concerning the Board's awareness and consideration of such facts prior to July 10, 2018 (or the lack thereof), the Proxy is rendered materially misleading.

### *Material Omissions Concerning the Financial Projections:*

67.     With respect to Envision's projected financial information, the Proxy Statement omits material information pertaining to the financial projections Envision's management prepared in connection with the Proposed Transaction. Specifically, the Proxy Statement

discloses two separate sets of certain financial forecasts for the Company on Page 50-51 of the Proxy Statement.

68.     These two sets, labeled the "Management Case" and "Management Sensitivity Case" financial projections, include projected values for the years 2018-2022 for the following financial information: (i) Revenue; (ii) Adjusted EBITDA; (iii) Adjusted EBITDA Margin; (iv) Adjusted EPS; and (v) Unlevered Free Cash Flow. With regard to the financial projections in the Management Case the Proxy Statement includes:

| | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| *(in millions, except per share items)* | **2018** | **2019** | **2020** | **2021** | **2022** |
| Revenue | $8,525.8 | $9,407.6 | $10,463.4 | $11,639.0 | $13,085.7 |
| *% growth* | | *10.3%* | *11.2%* | *11.2%* | *12.4%* |
| Adjusted EBITDA | $994.5 | $1,155.5 | $1,313.8 | $1,477.7 | $1,689.6 |
| Adjusted EBITDA Margin | 11.7% | 12.3% | 12.6% | 12.7% | 12.9% |
| *% growth* | | *16.2%* | *13.7%* | *12.5%* | *14.3%* |
| Adjusted EPS | $3.67 | $4.63 | $5.42 | $6.21 | $7.15 |
| *% growth* | | *26.1%* | *17.2%* | *14.5%* | *15.1%* |
| Unlevered Free Cash Flow | $88.6 | $25.6 | ($70.7) | ($67.0) | ($680.9) |

With regard to the financial projections in the Management Sensitivity Case, the Proxy Statement includes:

| | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| *(in millions, except per share items)* | **2018** | **2019** | **2020** | **2021** | **2022** |
| Revenue | $8,525.8 | $9,297.9 | $10,225.5 | $11,256.3 | $12,550.6 |
| *% growth* | | *9.1%* | *10.0%* | *10.1%* | *11.5%* |
| Adjusted EBITDA | $994.5 | $1,099.6 | $1,213.4 | $1,326.2 | $1,478.7 |
| Adjusted EBITDA Margin | 11.7% | 11.8% | 11.9% | 11.8% | 11.8% |
| *% growth* | | *10.6%* | *10.3%* | *9.3%* | *11.5%* |
| Adjusted EPS | $3.67 | $4.29 | $4.81 | $5.28 | $5.84 |
| *% growth* | | *16.9%* | *12.1%* | *9.8%* | *10.7%* |
| Unlevered Free Cash Flow | $88.6 | ($15.9) | ($147.9) | ($182.7) | ($843.5) |

69.     Adjusted EBITDA, Adjusted EBITDA Margin, Adjusted EPS, and Unlevered Free Cash Flow are all non-GAAP accounting metrics. However, the Proxy Statement omits to disclose the metrics used to calculate these non-GAAP measures or otherwise reconcile these non-GAAP projections to the most comparable GAAP measures. The omission of this information is particularly troubling for Envision shareholders. In attempting to account for the

failure to provide the corresponding line items used to calculate these non-GAAP projections, the

Proxy Statement notes:

> The definitions for these non-GAAP financial measures are set forth in Annex G of this proxy statement. Envision is not providing a quantitative reconciliation of these non-GAAP financial measures. In accordance with Item 10(e)(1)(i)(B) of Regulation S-K, a quantitative reconciliation of a forward-looking non-GAAP financial measure is only required to the extent it is available without unreasonable efforts. The Company does not currently have sufficient data to accurately estimate the variables and individual adjustments for such reconciliation, including normal variability in tax expense, equity compensation, and severance and related costs for future periods. The Company is unable to quantify the probable significance of these items at this time. The adjustments required for any such reconciliation of Envision's forward-looking non-GAAP financial measures cannot be accurately forecast by Envision, and therefore the reconciliation has been omitted.

Proxy Statement at 49. This is insufficient. By providing projected values for these metrics without fully disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projections to corresponding GAAP measures, the provided disclosures are rendered materially incomplete and misleading.

70.   Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance. Because of the non-standardized and potentially manipulative nature of non-GAAP measures, when a company discloses information in a Proxy Statement that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information.

71.   In light of the fact that these projections from the Management Case and the Management Sensitivity Case were utilized by the Financial Advisors in their valuation calculations, including their discounted cash flow analyses, the Company's shareholders require

this reconciliation information to assess the fairness of the Merger Consideration and determine whether to vote in favor of the merger.

### Material Omissions Concerning JP Morgan's Valuation Analyses:

72.     With respect to J.P. Morgan's financial analyses of the Proposed Transaction, the Proxy Statement details the financial advisor's fairness opinion and the various valuation analyses performed to render such opinion, but omits to disclose necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.

73.     Specifically, with respect to J.P. Morgan's *Public Trading Multiples* analysis, the Proxy Statement fails to disclose the specific observed multiples for each analyzed comparable company following, nor does it provide the reasoning behind J.P. Morgan's decision to only include data from two publicly traded companies.

74.     Similarly, with respect to J.P. Morgan's *Selected Transactions Analysis*, the Proxy Statement omits to disclose: (i) the specific observed multiples for each transaction; (ii) the value of each selected transaction; (iii) the date on which each transaction closed.

75.     Finally, in addition to the omitted information regarding free cash flows identified above, JP Morgan's *Discounted Cash Flow Analysis* is missing several key components that JP Morgan used in its analysis. Accordingly, with respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the individual inputs and assumptions used in the selection of discount rates of 8.0% to 9.0%; and (ii) the inputs and assumptions used to calculate the perpetuity growth rates of Envision's estimated free cash flows and terminal asset values range at the end of the five-year period ending in 2022 ranging from 1.0 % to 1.5%.

### Material Omissions Concerning Evercore's Valuation Analyses:

76.     With respect to Evercore's financial analyses of the proposed transaction, the Proxy Statement details the financial advisor's fairness opinion and the various valuation analyses performed to render such opinion, but omits to disclose necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.

77.     Specifically, with respect to Evercore's *Precedent Transactions Analysis*, the Proxy Statement omits to disclose: (i) the value of each selected transaction; (ii) the date on which each transaction closed.

78.     Furthermore, in addition to the omitted information regarding free cash flows identified above, Evercore's *Discounted Cash Flow Analysis* is missing several key components that Evercore used in its analysis. Accordingly, with respect to Evercore's Discounted Cash Flow Analysis, the Proxy fails to disclose: (i) the individual inputs and assumptions used in the selection of discount rates of 8.0% to 9.0%; and (ii) the specific inputs and assumptions used to calculate the perpetuity growth rates of Envision's estimated 2023 unlevered free cash flows ranging from 1.0% to 2.0%.

### *Material Omissions Concerning Guggenheim's Valuation Analyses:*

79.     With respect to Guggenheim's financial analyses of the proposed transaction, the Proxy Statement details the financial advisor's fairness opinion and the various valuation analyses performed to render such opinion, but omits to disclose necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.

80.     Specifically, with respect to Guggenheim's *Selected Transactions Analysis*, the Proxy Statement omits to disclose: (i) the value of each selected transaction; (ii) the date on which each transaction closed.

81.     With respect to Guggenheim's *Public Trading Multiples* analysis, the Proxy Statement fails to disclose the reasoning behind Guggenheim's decision to only include data from two publicly traded companies.

82.     Furthermore, in addition to the omitted information regarding free cash flows identified above, Evercore's *Discounted Cash Flow Analysis* is missing several key components that Evercore used in its analysis. Accordingly, with respect to Evercore's Discounted Cash Flow Analysis, the Proxy fails to disclose: (i) the individual inputs and assumptions used in the selection of discount rates of 8.0% to 9.0%; and (ii) the specific inputs and assumptions used to calculate the perpetuity growth rates ranging from 1.0% to 1.5%.

83.     When a bankers' endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses are crucial to a fair presentation of the material facts. Furthermore, the disclosure of projected financial information provides stockholders with the best basis to project the future financial performance of a company, and allows stockholders to understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material, and must be disclosed if Envision stockholders are to make a fully informed decision. The omission of this information renders the statements made concerning the financial advisor's analyses and opinions materially misleading.

84.     Without such undisclosed information, Envision stockholders cannot evaluate for themselves whether the financial analyses performed by the Financial Advisors were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In

other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can evaluate the extent to which the Financial Advisors' respective opinions and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

85.     Based on the foregoing, the Proxy Statement violates Section 14(a) of the Exchange Act and applicable SEC regulations by materially misleading Envision stockholders. Envision public shareholders lack critical information necessary to evaluate the Proposed Transaction. Moreover, without the key financial information and related disclosures, Envision public shareholders cannot gauge the accuracy and reliability of the financial analyses performed by the Financial Advisors, and whether they can reasonably rely on the Financial Advisors' respective fairness opinion.

86.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

87.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

88.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

89.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy statement communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

90.     Furthermore, Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015.

91.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

92.     Here, Defendants have issued the Proxy Statement with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, amongst other things: (i) the background of the transaction; (ii) the Company's

financial projections; (iii) the valuation analyses performed by the Company's financial advisors, in support of their fairness opinions; and (iv) the potential conflicts of interest involving the financial advisors.

93. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to Envision common stockholders although they could have done so without extraordinary effort.

94. The Individual Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy Statement notes that the financial advisors reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by the financial advisors, as well as their respective fairness opinions and the assumptions made and matters considered in connection therewith.

95. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that

the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the financial advisors' analyses in connection with their receipt of the fairness opinion, question the advisors as to the derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy Statement, and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

96.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

97.     Envision is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy Statement.

98.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and Envision stockholders, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Envision stockholders have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Envision stockholders

be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for
### Violations of § 20(a) of the 1934 Act

99.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

100.    The Individual Defendants acted as controlling persons of Envision within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Envision and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

101.    Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

102.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy Statement contains the

unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the creation of the Proxy Statement.

103.    The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

104.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

105.    As set forth above, the Individual Defendants had the ability to exercise control over, and did control, a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

<b><u>PRAYER FOR RELIEF</u></b>

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

a)  declaring that the Proxy Statement is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b)  preliminarily and permanently, enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

c) to the extent the Proposed Transaction is consummated prior to the Court's entry of a final judgment, awarding Plaintiff rescissory damages against the Individual Defendants, including, but not limited to, pre-judgment and post-judgment interest;

d) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

e) granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: July 19, 2018                               **O'KELLY ERNST & JOYCE, LLC**

                                                   */s/ Ryan M. Ernst*
                                                   Ryan M. Ernst (#4788)
                                                   Daniel P. Murray (#5785)
                                                   901 N. Market St., Suite 1000
                                                   Wilmington, DE 19801
                                                   Telephone: (302) 778-4000
                                                   Facsimile: (302) 295-2873
                                                   Email: rernst@oelegal.com
                                                          dmurray@oelegal.com

                                                   **OF COUNSEL:**

                                                   **LEVI & KORSINSKY LLP**
                                                   Donald J. Enright (to be admitted *pro hac vice*)
                                                   Elizabeth K. Tripodi (to be admitted *pro hac vice*)
                                                   1101 30th Street, N.W., Suite 115
                                                   Washington, D.C. 20007
                                                   Telephone: (202) 524-4290
                                                   Facsimile: (202) 333-2121
                                                   Email: denright@zlk.com
                                                          etripodi@zlk.com

                                                   *Attorneys for Plaintiff*